UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEST HAND ENTERTAINMENT LLC,

                 Plaintiff,                       No. 12-cv-12786

vs.                                        Hon. Gerald E. Rosen

WIDEAWAKE-DEATHROW
ENTERTAINMENT, LLC; JOHN PAYNE;
D-SOUND SYNDICATE, LLC; ENTERTAINMENT
ONE, LTD.; ENTERTAINMENT ONE GP LLC *d/b/a*
*eOne Distribution U.S.A. a/k/a Entertainment One*
*Distribution, U.S.A. d/b/a eOne Music a/k/a/ Entertainment*
*One Music*; ENTERTAINMENT ONE U.S. LP *a/k/a eOne*
*Distribution U.S.A. d/b/a eOne Music a/k/a Entertainment*
*One Music,*

                 Defendants.

_____/

OPINION AND ORDER REGARDING
MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on March 31, 2014

PRESENT:Honorable Gerald E. Rosen
United States District Chief Judge

I. INTRODUCTION

      This multi-count action for copyright infringement and related claims is presently

before the Court on the parties' cross-motions for summary judgment. Responses and

replies have been filed. Having reviewed the parties' briefs, the accompanying exhibits,

1

and the record as a whole, the Court finds that the pertinent facts and legal contentions are sufficiently presented in these materials, and that oral argument would not assist in the resolution of this matter.  Accordingly, the Court will decide this matter "on the briefs."  *See* Eastern District of Michigan Local Rule 7.1(f)(2). This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTUAL BACKGROUND

The Parties

Plaintiff Best Hand Entertainment, LLC ("Best Hand"), is a Michigan limited liability company that operates as a record label for a number of Detroit music artists. The company's principal owner and President is Russell Marcilis II ("Marcilis").

Defendant Wideawake-Deathrow Entertainment, LLC ("Wideawake") is a limited liability company based in Toronto, Canada that was formed for the principal purpose of acquiring the music assets of the bankrupt Death Row Records at an auction in January 2009.  The Death Row Records music catalogue included recordings by several prominent rap artists such as Dr. Dre, Snoop Dog, and Tupac Shakur (the "Deathrow Catalogue").  Defendant Wideawake Entertainment Group, Inc. is an affiliate of Wideawake LLC.  At all times relevant to this action, Plaintiff John Payne, a resident of California, was Wideawake's President.

Defendant Entertainment One U.S., L.P. ("E-One") is one of the largest independent music and video distributors in North America.  E-One is based in New

York.  Prior to Wideawake's acquisition of the Death Row Catalogue in 2009, E-One was the exclusive distributor for Death Row Records.  After its acquisition of the Catalogue, Wideawake similarly selected E-One to be its exclusive distributor of the Death Row Catalogue.  Defendant Entertainment One GP, LLC ("E-One GP"), a Delaware limited liability company, is an affiliate of E-One.  Defendant Entertainment One Ltd. is a Toronto-based holding company that owns both E-One and E-One GP.

Defendant D-Sound Syndicate, LLC ("D-Sound") is a Michigan limited liability company that was formed, and equally owned, by Plaintiff Best Hand; Payne Production and Engineering, LLC (which is owned by Wideawake's President John Payne); TRP Management, LLC (owned by Todd Russell Perkins); and Grand Slamm Records, LLC (owned by Francetta Boyd) to jointly obtain distribution for their music.

The BST CD

In July of 2009, Best Hand's Russell Marcilis entered into a Partnership Agreement with Jewel L. Green *a/k/a* Caples, who is professional known as the recording artist "Jewell."  [*See* Defendants' Ex. B.]  Jewell had performed backup vocals on certain songs in the Death Row Catalogue.  It was the intention of Marcilis and Jewell to develop an autobiographical book based on Jewell's life to be accompanied by a soundtrack album.  The Partnership Agreement provided for a "50-50 split of all revenues, taxes, bills, etc., generated from any projects [Jewel Green and Marcilis] enter[ed] into," including all proceeds in connection with Jewell's "book, documentary, movie, and

3

music." *Id.*, ¶¶ 1, 8.  Jewell thereafter became Best Hand's Vice President.

Jewell's soundtrack album, entitled "Best Hand Entertainment Presents My Blood, My Sweat and My Tears - the Soundtrack" (referred to in this action as the "BST CD") is the subject of this litigation.

On August 19, 2010, Best Hand entered into a "Content License Agreement" with RBC Records of Burbank, California, pursuant to which Best Hand exclusively licensed the BST CD to RBC for world-wide distribution and exploitation.  *See* Complaint Ex. D.

THE D-SOUND OPERATING AND DISTRIBUTION AGREEMENTS

Sometime thereafter, in late 2010, Marcilis commenced discussions with Wideawake's principal, John Payne, about the formation of a record promotion company and the distribution of Best Hand's entire catalogue -- including the BST CD -- through Wideawake and/or E-One. Compl., ¶ 29. According to Marcilis, the agreement with regard to the formation of the promotion company was that Wideawake and/or Payne would capitalize the company with $300,000 to fund promotions.  Compl., ¶ 30.  As a result of these discussions, D-Sound Syndicate was formed.

On May 4, 2011, The members of D-Sound entered into an Operating Agreement, the stated purpose of which was to "[d]evelop, create, market and exploit intellectual property for the purposes of distribution to the general public."  [*See* Defendants' Ex. G, § 1.6].  Pursuant to this Operating Agreement, another of John Payne's companies, Payne Production and Engineering, LLC and Todd Perkins' company, TRP Management LLC,

were appointed "Co-Chief Executive Managers," and they were vested with "primary

responsibility for managing the operations of the company and for effectuating the

decisions of the Managers." *Id.* § 4.4.

> Section 4.3 of the Operating Agreement sets forth the "Powers of the Managers":

> The Mangers are authorized on the Company's behalf to make all decisions
> as to (a) the sale, development, lease or other disposition of the Company's
> assets; (b) the purchase or other acquisition of other assets of all kinds; (c)
> the management of all or any part of the Company's assets; (d) the
> borrowing of money and the granting of security interests in the Company's
> assets; (e) the pre-payment, refinancing or extension of any loan affecting
> the Company's assets; (f) the compromise or release of any of the
> Company's claims or debts; and (g) the employment of persons, firms or
> corporations for the operation and management of the company's business.
> In the exercise of their management powers, the Managers are authorized to
> execute and deliver (a) contracts, conveyances, assignments, leases, sub-
> leases, franchise agreements, licensing agreements, management contracts
> and maintenance contracts covering or affecting the Company's assets; (b)
> all checks, drafts and other orders for the payment of the Company's funds;
> (c) all promissory notes, loans, security agreements and other similar
> documents; and (d) all other instruments of any other kind relating to the
> Company's affairs, whether like or unlike the foregoing.

Defendants' Ex. G, § 4.3.

> Plaintiff Best Hand's principal, Russell Marcilis, signed the D-Sound Operating

Agreement on behalf of Best Hand. *Id.*

> On June 1, 2011, D-Sound entered into a "Distribution Agreement" with

Defendant Wideawake. [*See* Defendants' Ex. H]. The Agreement was signed on behalf

of "D-Sound Syndicate, LLC" by "Todd Russell Perkins," and had an effective date of

June 1, 2011. *Id.* The Agreement granted Wideawake an exclusive right to distribute,

5

throughout "the universe," D-Sound's mass marketable audio and video products sold

through all wholesale and retail channels in both physical compact-disc and digital

download formats. *Id.*, § 2(a). It further declared Wideawake to be the "exclusive

licensee" of D-Sound's rights in all master recordings of such products (and all

reproductions derived therefrom), *id.*, § 2(d), and specifically gave Wideawake "the

exclusive right," with respect to all products covered by the agreement:

> (i)    To manufacture, advertise, sell, lease, license the Masters and derivatives thereof (including but not limited to phonorecords and via any form of DEMD) in any and all media and/or fields of use, whether such derivatives, media and fields of use are now known or hereafter invented;

> (ii)   To the extent Company has such rights, to use and publish and to permit others to use and publish the names of any artists performing or any of the album(s) (including "stickering" the applicable album package), and to use and publish Company trademark(s), solely in connection with the album(s), and to use and publish any artist's voice, approved photographs, approved likenesses and approved biographical material for advertising and trade purposes, solely in connection with the sale and exploitation of Products hereunder, and to use the artwork for the Product(s), free and clear of any claims by any entity;

> (iii)  To release records derived from the Masters under any name, trademark or label owned or controlled by Company; and

> (iv)   To perform the Masters and records embodying the Masters, and to permit performances thereof by means of radio broadcast, television or any other method now or hereafter known or devised. Notwithstanding the foregoing, WA shall have the nonexclusive right to grant any so-called master use or synchronization licenses subject to Company's approval. (If Company denies the approval of a license, it will not then grant such license directly or indirectly without paying WA the WA Share.)

6

*Id*., § 2(d)(i)-(iv).

Schedule A appended to the Agreement bears the title "List of Products."  *See* Defendants' Ex. H.  However, this page is blank.  *Id.*

Marcilis claims he was unaware of Perkins' June 1 execution of the D-Sound Distribution Agreement.  He asserts that, after D-Sound was organized, he repeatedly pressed John Payne to provide him an acceptable distribution agreement and that each time Payne reassured him that a suitable agreement would be forthcoming.  Based on those reassurances, Best Hand terminated the distribution agreement it had with RBC and waited for Wideawake's proposed agreement.  Compl., ¶¶ 36-37, 47;  Complaint Ex. H.

Meanwhile, in July 2011, Best Hand applied for and obtained Certificates of Copyright Registration for the 13 recordings that comprise the BST CD.  *See* Complaint Ex. K.

The evidence of record further shows that during July and August 2011, the parties proceeded with plans for distribution of the BST CD.  October 25, 2011 was locked in as the release date for the CD.  [Marcilis Dep., pp. 37-40.]  Best Hand also provided Wideawake the UPC number and UPC graphic for the CD and links to various internet sites for information related to the BST CD.  *See* Defendants' Ex. L-N.  Wideawake sent Best Hand a copy of its logo "for your future use."  Defendants' Ex. U;  Marcilis Dep. 48-49.  Best Hand, in turn, provided Wideawake its company logo.  Defendants' Ex. Z. Wideawake thereafter advised Best Hand that it still needed D-

7

Sound's logo and that once it was received, Wideawake's logo, D-Sound's logo, and Best Hand's logo would appear, in that order, on the CD.  Defendants' Ex. V; Marcilis Dep., 48-49.

In August 2011, Marcilis was finally presented with a proposed distribution agreement.  This proposed agreement, however, was not completed; it did not even contain of the parties' names.  Marcilis deemed the agreement -- the terms of which in substance were the same as in the June 1 executed agreement -- unacceptable, and he so informed Wideawake.  He requested that Wideawake present an acceptable agreement so it could be executed prior to the planned October 25, 2011 release of the BST CD.  Compl., ¶ 43.

Around this same time in late August 2011, Marcilis provided Wideawake's president, John Payne, with the Master copy of Jewell's BST CD to preview.  Wideawake confirmed receipt of the CD and informed Marcilis "we are having a listen to make sure everything is good to go before we send it to our manufacturer."  Defendants' Ex. DD, Marcilis Dep. at 59, 121.  On August 31, 2011, Best Hand forwarded to Wideawake a list of the songs, artists and running times of the songs on the CD and shortly thereafter provided Wideawake with photographs of Jewell that Wideawake had requested for "promotion and press" with respect to the BST CD.  *See* Defendants' Ex. GG, HH, and JJ.

As of August 31, 2011, however, Best Hand had yet to receive an acceptable

distribution agreement from Wideawake.  Instead, even though it had been communicating all along with Marcilis, on September 8, 2011, Wideawake bypassed Marcilis and forwarded an "Exclusive Recording Agreement" directly to Marcilis's partner, Jewell.  This "Recording Agreement" would have given Wideawake "all rights, title and interest, including the copyrights (and all renewals, extensions, reversions thereof), in perpetuity" to all of Jewell's music and further would have given Wideawake the exclusive right to use Jewell's name, likeness, biographical materials in connection with the exploitation of Jewell's recordings and in general advertising.  *See* Complaint Ex. O.  Jewell did not execute or accept this Recording Agreement.

Nonetheless, on October 25, 2011, Wideawake and E-One commercially released the BST CD.  *See* Complaint Ex. P.  As released, the BST CD identified Wideawake as the exclusive owner of the BST copyrighted sound recordings.  *See* Complaint, Ex. B.  Online music sellers listed E-One as the distributor of the CD.  *See* Complaint Ex. Q.

It was not until November 2011 that John Payne finally provided Marcilis with the D-Sound/Wideawake Distribution Agreement which had been executed by Todd Perkins on behalf of D-Sound five months earlier, relying on the D-Sound Distribution Agreement as its authority for releasing and distributing the BST CD.

Following the release of the BST CD, Best Hand, through counsel, sent a letter to Wideawake notifying it that its actions were a violation of the Copyright Act. Wideawake responded acknowledging that the copyright attributions on the CD were

9

wrong but stated that the D-Sound Operating Agreement and the D-Sound Distribution Agreement authorized Wideawake's distribution of the CD.  *See* Complaint, Ex. T.

## III.  DISCUSSION

### A.   APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "the mere

existence of a scintilla of evidence that supports the nonmoving party's claims is

insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal

quotation marks, and citation omitted). The Court will apply the foregoing standards in

deciding the parties' motions for summary judgment in this case.

B.    ISSUES OF FACT PRECLUDE THE GRANTING OF SUMMARY
      JUDGMENT ON COUNTS I-III OF PLAINTIFF'S COMPLAINT

        In Counts I-III of its Complaint, Plaintiff asserts claims of federal copyright

infringement, vicarious infringement, and contributory infringement against the

Wideawake and E-One Defendants based upon the alleged unauthorized distribution of

the BST CD.

        Under the Copyright Act, the owner of a copyright has the exclusive rights (1) to

reproduce the copyrighted work; (2) to prepare derivative works; (3) to distribute copies;

(4) to perform publicly a copyrighted work; and (5) to display publicly a copyrighted

work. 17 U.S.C. § 106. A plaintiff may bring a claim against a person who infringes any

of the plaintiff's exclusive rights in a copyright under § 106 by demonstrating two

elements: "(1) ownership of a valid copyright; and (2) copying of constituent elements of

the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340,

361, 111 S.Ct. 1282, 1296 (1991); *accord Kohus v. Mariol*, 328 F.3d 848, 853 (6th

Cir.2003). The term "copying" means the infringement of any of a copyright holder's

exclusive rights under 17 U.S.C. § 106. *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085

n. 3 (9th Cir.1989).

11

1.      DEFENDANTS WERE NEVER GRANTED AN EXCLUSIVE LICENSE TO
        DISTRIBUTE THE BST CD

A copyright owner may transfer to another person any of the exclusive rights the

owner has in the copyright; however, such a transfer "is not valid unless an instrument of

conveyance, or a note or memorandum of the transfer, is in writing and signed by the

owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. §

204(a).  A "transfer of copyright ownership" includes an exclusive license.  17 U.S.C. §

101.[1]

It is undisputed that Plaintiff Best Hand is the owner of the copyrights at issue

here.  Defendants, however, argue that Plaintiff granted them an exclusive license to

distribute the copyrighted materials.  "The existence of a license creates an affirmative

defense to a claim of copyright infringement."  *Worldwide Church of God v.*

*Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000).

Defendants do not contend that Russell Marcilis or any other principal of Best

---

[1] In relevant part, 17 U.S.C. §101 provides:

A "transfer of copyright ownership" is an assignment, mortgage, exclusive
license, or any other conveyance, alienation, or hypothecation of a
copyright or of any of the exclusive rights comprised in a copyright,
whether or not it is limited in time or place of effect, but not including a
nonexclusive license.

17 U.S.C. § 101.

Hand signed the D-Sound Distribution Agreement.  Only Todd Perkins signed the Agreement, and he signed it only on behalf of "D-Sound Syndicate LLC."  Defendants maintain, however, that by signing the D-Sound Operating Agreement which appointed Todd Perkins a Co-Executive Manager and authorized Perkins to execute contracts on behalf of the company, Best Hand authorized the execution of the D-Sound Distribution Agreement.  However, as indicated, Perkins expressly signed the Distribution Agreement *on behalf of D-Sound Syndicate, LLC*, only.  Nothing in Perkins' execution of the Distribution Agreement evidences that Perkins executed it on behalf of Best Hand. Indeed, the plain language of the D-Sound Operating Agreement states, "No member shall be an agent of any other member of the company solely by reason of being a member."  *See* Defendants' Ex. G.  The Operating Agreement authorized the Managers of D-Sound to act as agents of D-Sound, but they never had the authority to sign away the exclusive copyright rights of Best Hand.

Moreover, there is no agreement or other writing evidencing Best Hand's transfer or assignment of its copyrights to the D-Sound Syndicate.  Although there is an appendix to the D-Sound Operating Agreement captioned "Capital Contributions" providing a space to describe each individual member's capital contributions to the company, that page of the Agreement is blank.

Based upon the foregoing, the Court concludes that Defendants have failed to establish that they were granted an exclusive license to distribute Plaintiff's copyrighted

13

material.

Defendants, however, argue, in the alternative, that there is sufficient evidence of record to demonstrate that Plaintiff impliedly granted them a non-exclusive license to distribute the BST CD.

2.     ISSUES OF FACT PRECLUDE THE GRANTING OF SUMMARY
       JUDGMENT ON DEFENDANTS' IMPLIED NON-EXCLUSIVE LICENSE
       THEORY.

An "implied license" is an unwritten license to use a work that the court infers from the circumstances and from the conduct between the parties. *See Bridgeport Music, Inc. v. WM Music Corp.,* 508 F. 3d 394, 398-99 (6th Cir. 2007). "[T]he existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement." *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). Such a "non-exclusive license. . . is not. . . subject to a writing requirement" and "may be implied from conduct." *Id.* (internal quotation omitted). There is no precise formula for determining whether an implied license exists, but rather, the court is to examine the "intent" of the parties from the "totality of the circumstances." *Jeffrey A. Grusenmeyer & Assoc., Inc. v. Davison, Smith & Certo Architects, Inc.*, 212 F. App'x 510, 514 (6th Cir. 2007); *see also I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir.1996) (In determining whether an implied license exists, a court should look at objective factors evincing the party's intent.). That is, the court should explore, based on the facts and circumstances of the individual case, whether the evidence supports the notion that the parties, in essence,

14

made an agreement permitting the defendant to use the work, consistent with certain understandings and terms. *Johnson*, 149 F.3d at 500-02. "The key issue, again, is intent, and the key question is whether the facts and circumstances demonstrate that 'the copyright owners intended that their copyrighted works be used in the manner in which they were eventually used.'" *Melanie Howard Music, Inc. v. Warner Bros. Records, Inc.*, 2009 WL 3784611 at *6 (M.D. Tenn. Nov. 10, 2009) (quoting *Johnson*, 149 F.3d at 502). The party claiming the existence of an implied license has the burden of proving the license. *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

Defendants contend that the evidence of record, particularly the evidence discussed at pp. 7-14 of their Brief and highlighted above demonstrates that, by its conduct, Best Hand granted them an implied license to distribute the BST CD. Plaintiff on the other hand contends that there can be no implied license found here and, therefore, Defendants' actions cannot be excused on this theory.

The Court finds that significant disputed issues of fact exist as to whether a non-exclusive license may be implied from the totality of the circumstances such that neither party is entitled to summary judgment on Counts I-III.

The evidence of record that Defendants rely upon certainly shows that in July through September 2011, the parties took actions in preparation to release the BST CD on October 25, 2011and that Best Hand was complicit in these actions. However, the evidence also shows that Russell Marcilis of Best Hand had been promised by John

15

Payne of Wideawake all along that a distribution agreement would be forthcoming and that Marcilis made it clear to Payne that the CD was not going to be released for distribution until he had an appropriate agreement which provided Best Hand satisfactory compensation.

It is the Court's view that, on this evidence, a reasonable jury could find either way on the implied license issue.  Both sides have advanced more than a "scintilla" of evidence in support of their respective positions on the implied license issue.  The totality of the evidence gives "mixed signals" on the issue of intent.  Therefore, the Court cannot say, as a matter of law, that there was or was not an implied license here.  This is a matter for the jury.[2]

## C.   PLAINTIFF CANNOT MAKE OUT A LANHAM ACT CLAIM UNDER THESE FACTS

In Counts IV and V, Plaintiff purports to allege claims under the Lanham Act, 15 U.S.C. § 1125.  Plaintiff's Count IV is a "false attribution" claim.  In this count, Best Hand asserts that because it owned copyrights in the BST CD, the false identification of Wideawake and E-One on the CD as the owners of Plaintiff's copyrighted works caused confusion as to the origin of the BST CD.  *See* Compl., ¶¶ 95-97.  Count V is captioned as a "false representation" claim.  This count similarly asserts that because Plaintiff did not grant Wideawake or E-One a license to manufacture and distribute the BST CD, E-

---

[2] Similarly, issues of fact preclude summary judgment on Wideawake's copyright infringement counter-claim.

One and Wideawake falsely represented on the CD (a) that Plaintiff distributed the BST

CD or (b) that Plaintiff gave them permission to distribute the BST CD.

Section 43(a)(1) of the Act, 15 U.S.C. § 1125(a)(1), provides, in relevant part:

(1) Any person who, on or in connection with any goods or services, or any
container for goods, uses in commerce any word, term, name, symbol, or
device, or any combination thereof, or any false designation of origin, false
or misleading description of fact, or false or misleading representation of
fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the
affiliation, connection, or association of such person with another person,
or as to the origin, sponsorship, or approval of his or her goods, services, or
commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another
person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is
or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A), (B).

However, the Supreme Court has held that a copyright interest is not a "good"

whose "origin" can be falsely designated. *See Dastar Corp. v. Twentieth Century Fox

Film Corp.*, 539 U.S. 23, 37, 123 S. Ct. 2041 (2003). In *Dastar*, The Court considered

the meaning of the phrase "origin of goods" in § 43(a) of the Lanham Act and concluded,

[T]he phrase 'origin of goods' in the Lanham Act [ ] refers to the producer
of the tangible goods that are offered for sale, and not to the author of any
idea, concept, or communication embodied in those goods. *Cf*. 17 U.S.C. §
202 (distinguishing between a copyrighted work and "any material object
in which the work is embodied"). To hold otherwise would be akin to
finding that § 43(a) created a species of perpetual patent and copyright,

17

which Congress may not do.

*Id.* at 37.

Therefore, "taking tangible goods and reselling them as your own constitutes a Lanham Act violation; taking the intellectual property contained in those goods and incorporating it into your own goods does not." *Nat. Bus. Dev. Servs., Inc. v. Am. Credit Educ. and Consult., Inc.*, 299 F. App'x 509, 511 (6th Cir. 2008) (citations omitted).

In light of *Dastar*, federal district courts have concluded that Lanham Act claims which are nothing more than "camouflaged copyright infringement claims" should be dismissed. *See e.g.*, *Remark LLC v. Adell Broadcasting*, 817 F. Supp. 2d 990, 998 (E.D. Mich. 2011); *Hustlers, Inc. v. Thomasson,* 2004 WL 3241667 at * 3 (N.D. Ga. 2004) (failure to properly attribute copyright ownership in music not actionable under the Lanham Act); *Williams v. UMG Recordings, Inc.*, 281 F. Supp. 2d 117, 1183-85 (C.D. Cal. 2003) (failure to credit writer/director of motion picture not actionable under Lanham Act); *Boston Intern. Music, Inc. v. Austin*, 2003 WL 22119228 at * 2 (D. Mass. 2003) (author of copyrighted song is not origin of product and not entitled to protection under the Lanham Act).

The above authorities establish that Plaintiff's Lanham Act claims in Counts IV and V have no legal viability. Therefore, the Court will grant Defendants' Motion for Summary Judgment on these claims and Counts IV and V of Plaintiff's Complaint will

18

be dismissed.

D.   THE SAME ISSUES OF FACT THAT PRECLUDE SUMMARY JUDGMENT ON COUNTS I-III PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S COUNT VI.

In Count VI, Plaintiff alleges a right of privacy claim based upon the unauthorized "appropriation of Jewell's likeness."  While it is true that a party may waive the right to privacy by authorizing the appropriation of his or her name or likeness, and such a waiver can be implied when a "clear, unequivocal and decisive act of the party showing such a purpose" is shown, *Armstrong v. Eagle Rock Entm't, Inc.*, 655 F. Supp. 2d 779, 784-85 (E.D. Mich. 2009), as discussed above, issues of fact surround the question of Plaintiff's authorization.  Therefore, as with Counts I-III, summary judgment on Count VI is precluded.

E.   PLAINTIFF'S CLAIMS IN COUNTS VII AND X ARE PREEMPTED UNDER THE COPYRIGHT ACT

In Count VII, Plaintiff alleges a Michigan common law claim of unfair competition, and in Count X, Plaintiff alleges a claim of unjust enrichment/quantum meruit.  Both of these counts are predicated on Defendants' distribution of the BST CD. As a matter of law, these claims are preempted by the Copyright Act.  *See Murray Hill Publ'ns, Inc. v. ABC Communs., Inc.*, 264 F.3d 622, 626, 635-38 (6th Cir. 2001) (conversion, unfair competition and unjust enrichment claims preempted); *see also RSR Sales, Inc. v. Lowe's Cos.*, 2013 WL 1858592 at * (E.D. Mich. 2013) (unfair competition and unjust enrichment claims preempted under federal copyright law); *Nat. Bus. Dev.*

19

*Servs v. Am. Credit Educ. and Consulting, Inc.*, 2008 WL 186367 (E.D. Mich. 2008)

(same).

F.    ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS'
      BREACH OF CONTRACT, PROMISSORY ESTOPPEL AND TORTIOUS
      INTERFERENCE CLAIMS

In Count VIII Plaintiff alleges a claim of breach of oral contract and in Count IX

Plaintiff alleges a claim of promissory estoppel, both based upon John Payne's alleged

oral promise to fund D-Sound with $300,000 for the promotion of the record labels of the

members of D-Sound.  Though Defendants deny the existence of any such contract,

Plaintiff, through sworn deposition testimony, has presented more than a scintilla of

evidence showing that such an oral promise was made and that Plaintiff relied upon that

promise to its detriment.  Therefore, whether such an oral promise was made and relied

upon, and whether the promise rises to the level of an oral contract and, if so, whether it

was breached are matters for the jury to decide.

Similarly, Plaintiff's tortious interference claims in Counts XI and XII are based

upon Payne's promise and his alleged inducement of Plaintiff's termination of its

distribution contract with RBC.  The same issues of fact discussed above in this Opinion

preclude summary judgment on these claims, as well.

20

CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment **[Dkt. # 45]** is GRANTED, in part, and DENIED, in part.

Defendants' Motion is granted and summary judgment in Defendants' favor is hereby entered on Plaintiffs' Lanham Act claims **(Counts IV and V)**, unfair competition claim **(Count VII)** and unjust enrichment/quantum meruit claim **(Count X)**. These claims, accordingly, will be DISMISSED. In all other respects, Defendants' Motion for Summary Judgment is denied.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment **[Dkt. # 46]** is DENIED.

Accordingly, this case will proceed to trial.

SO ORDERED.


                              s/Gerald E. Rosen
                              Chief Judge, United States District Court

Dated:  March 31, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 31, 2014, by electronic and/or ordinary mail.

                              s/Julie Owens
                              Case Manager, (313) 234-5135

21